**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:25-cr-31 (02) |
| Plaintiff, | : | |
| v. | : | |
| RYAN WADE JOHNSTON, | : | |
| Defendant. | : | |

**RYAN JOHNSTON'S POSITION WITH RESPECT TO SENTENCING AND MOTION FOR DOWNARD VARIANCE**

For the reasons set forth herein, Mr. Ryan Johnston respectfully requests this Court sentence him to 120 months. Mr. Johnston is subject to a mandatory minimum sentence of 60 months (5 years) and a statutory maximum of 240 months (20 years). There is a significant Guideline dispute in this case. The PSR sets forth Mr. Johnston's Guideline range as 360 to 960 months, however the defense believes the Guidelines range is 151 to 188 months.

Resolving the Guidelines dispute and determining a sentence that is no greater than necessary turns on interpreting Ryan's behavior and intent. This position paper sets out to "set the stage" so to speak before addressing the outstanding Guidelines objections and then moving on to address other § 3553A factors.

Due to the unusual length of this position paper, a Table of Contents is included.

**I. Mr. Johnston's PTSD, meth addiction, and actions through his arrest on this case.. 3**
A. The link between PTSD and problematic substance use, risky sexual behavior, and thrill seeking. .... 4
B. Mr. Johnston's drug addiction began with pain pills .... 5
C. Mr. Johnston sought treatment for his PTSD. .... 6
D. His daughter was born and for life insurance purposes, Ryan stopped his medications. 7
E. Mr. Johnston developed a methamphetamine addiction. .... 7
F. Ryan sent a cry for help to the VA but never followed through for treatment. .... 7
G. The link between methamphetamine use and high-risk sexual behavior. .... 8
H. Mr. Johnston began to possess CSAM. .... 8
I. Possession of CSAM does not, on its own, indicate a proclivity towards production or hands on offenses. .... 9
J. Ryan once again seeks treatment. .... 13
K. Rock bottom and meeting M. .... 14
L. The Count 12A photograph is taken. .... 15
M. Mr. Johnston encountered Alex Buenaga online. .... 16
N. Law enforcement encountered Alex Buenaga online. .... 16
O. January 23, 2024 .... 16
P. January 24, 2025. .... 17
Q. Mr. Johnston's post-arrest interview. .... 18
R. Doc drove by. .... 19
S. Negative Forensic Interviews of MV2 and the other minors. .... 19
**II. Guidelines .... 19**
A. Whether Mr. Johnston intended to engage in sexual activity with MV1 - Paragraphs 27, 34, and 35 .... 20
B. Count 12A - Paragraphs 50-61 .... 21
1. Mini-bench trial interpretation .... 22
2. Guilty plea interpretation .... 30
3. Whether the offense involved sexual act or sexual contact – Paragraph 51 .... 32
**III. Acceptance of Responsibility .... 33**
**IV. Mitigating Factors, Aggravating Factors, and Problems with the Guidelines .... 34**
**V. Sentencing Disparities .... 37**
A. Prior convictions for sex offenses .... 37
B. Multiple hands on offenses while producing CSAM .... 38
C. Production of CSAM committed without touching a child .... 41
**VI. Ryan has support for his future .... 42**

## I. Mr. Johnston's PTSD, meth addiction, and actions through his arrest on this case

Mr. Johnston's military records paint a picture of him that presents a stark contrast from the picture painted at the time of his arrest in this case. For his duties in support of Operation Iraqi Freedom from February 19 to September 10, 2004, Mr. Johnston was "highly recommended for the Navy and Marine Corps Achievement Medal." (Citation Record, Exh. A[1] - 002). The Summary of Action notes that Mr. Johnston assumed "the workload of three Marines" and "conducted all mission preparation independently." (*Id.*). "While on civil affairs operations, he supervised all interior security matters during meetings with government/civil leaders, sheikhs, or local leaders, tactically positioning attached Marines to ensure proper security." (*Id.*). "Corporal Johnston participated in more than 50 civil affairs missions from February – September 2004. His understanding of civil- military operations and their logistical requirements negated the need for constant supervision." (*Id.*). Mr. Johnston "supervised Marines and Iraqi civilians, helped to manage more than one million dollars in reconstruction money, assumed the logical responsibility for all CA missions, and was tasked with overseeing all interior security requirements during Coalition-Iraqi meetings in [Ar-]Rutbah, Akashat, Trebil, and Al Waleed." (*Id.*). "His exceptional leadership, professionalism, and total devotion to duty reflected great credit upon himself and were in keeping with the highest traditions of the United States Naval Service." (*Id.* at 003). This was not the only award Mr. Johnston received. (Select Military Records, Exh. B - 002).

---

[1] Exhibit labels are in the bottom, right hand corner of the documents.

Mr. Johnston's experience in Iraq was not all positive. His certificate of discharge from activity notes he was "in imminent danger zone in Iraq from 20040219 – 20040914." (*Id.* at 001). Ryan would later be diagnosed with PTSD stemming from his time in Iraq.

In the summer of 2007, Ryan Johnston and his father were tested to see if they were a match to Ryan's half-brother who desperately needed a kidney. Ryan pushed to be the donor. The transplant took place on January 15, 2008. With the surgery, came the pain pills. Ryan's PTSD made a slide into drug addiction all the more likely for him.

**A. The link between PTSD and problematic substance use, risky sexual behavior, and thrill seeking.**

In a 2014 article in Military Medicine, researchers noted, "…veterans with PTSD, regardless of mTBI status, reported engaging in more frequent risk behaviors and reported a greater tendency to engage in impulsive behaviors when in a negative affective state." Lisa M. James, et al, *Risk-Taking Behaviors and Impulsivity Among Veterans With an Without PTSD and Mild TBI*, Military Medicine 179, (Attached as Exh. C). "Negative affectivity is negative emotions and expression, which includes sadness, disgust, lethargy, fear, and distress." Courtney Ackerman, *What is Positive and Negative Affect? Definitions + Scale*, PositivePsychology (Nov. 8, 2018).[2] One of the problems with PTSD is that suffers may resort to impulsive or risky behaviors as "a means to modulate negative affect." (Exh. C – 001). "Second, Sensation Seeking reflects the tendency to enjoy and pursue activities that are new and exciting and has been linked to engagement in risk-taking behaviors." (*Id.*) PTSD in veterans has been linked to among other things, problematic substance use, elevated rates of risky sexual behavior, and thrill seeking. (*Id.*)

---

[2] https://positivepsychology.com/positive-negative-affect/.

Experiencing significant trauma to the point of PTSD can negatively impact the brain's ability to control emotions and impulses. Bessel Van Der Kolk, M.D., *The Body Keeps the Score*, Brain, Mind, and Body in the Healing of Trauma, 62-63 (Penguin Books) (2015). For a healthy brain:

> If the amygdala is the smoke detector in the brain, think of the front lobes – and specifically the medial prefontral cortext (MPFC), located directly above our eyes – as the watchtower, offering a view of the scene from on high. Is that smoke you smell the sign that your house is on fire and you need to get out fast – or is it coming from the steak you put over too high a flame? The amygdala doesn't make such judgments; it just gets you ready to fight back or escape, even before the frontal lobes get a chance to weigh in with their assessment. As long as you are not too upset, your frontal lobes can restore your balance by helping you realize that you are responding to a false alarm and abort the stress response."

*Id.* at 62. Unfortunately, for people with PTSD, the balance between the "amygdala (smoke detector) and the MPFC (watchtower)" shift "radically." *Id.* It becomes "harder to control emotions and impulses." *Id.* at 62-63.

In relation to negative affectation, "Neuroimaging studies of human beings in highly emotional states reveal that intense fear, sadness, and anger all increase the activation of subcortical brain regions involved in emotions and significantly reduce the activity in various areas in the frontal lobe, particularly the MPFC," (the watchtower). *Id.* at 63. When the thinking part of the brain is not functioning as well as it should, the ability of the frontal lobe to inhibit bad or harmful conduct breaks down leaving people to have abnormally intense reactions to small frustrations. *Id.*

**B. Mr. Johnston's drug addiction began with pain pills**

While he had used drugs in the past, his active addiction started with Oxy following the surgery. Ryan reported taking up to 15 pills a day. Pain pilled slowed his brain down and made it

easier for him to manage, or so he felt. In 2014, Ryan resorted to steeling scrap metal to pay for his addiction. Mr. Johnston was charged on January 13, 2014, with misdemeanor embezzlement for stealing and selling $11,000 worth of metal items and $1,000 worth of gas. (PSR at ¶ 70).

As a result of his charges, Ryan started drug treatment. At the time, being put on Suboxone "saved" him. According to his VA medical records, Ryan was given suboxone in June of 2015. (Select Medical Records, Exh. D - 039 ). Ryan had a positive screening for depression around the same time. (*Id.* at 026, 030). He reported having little interest or pleasure in doing things nearly every day. He also reported problems with feeling down, depressed or hopeless, trouble sleeping and trouble with his appetite. (*Id.*).

**C. Mr. Johnston sought treatment for his PTSD.**

In March of 2014, while his embezzlement case was pending, Ryan applied to a PTSD treatment program through the VA. (*Id.* at 041). He was not treated for PTSD at that time but was treated and attended therapy for his drug addiction. In July of 2015, the drug treatment providers referred Ryan for evaluation of his PTSD symptoms. (*Id.* at 025). A report written on September 9, 2015, indicates that Mr. Johnston was experiencing PTSD. (*Id.* at 018-019).

Ryan's treatment had some successes. In October of 2015, Ryan reported to the VA that he was excited about a possible job offer from UPS. (*Id.* at 017). He had also obtained an engagement ring for his significant other and planned to propose in the next few weeks. (*Id.*). Both the job and the engagement came through by November of 2015. (*Id.* at 016). Around this time, Ryan successfully completed his supervised probation for his embezzlement charge. (PSR at ¶ 70). While Ryan persisted in seeking treatment for almost one more year, he stopped in November of 2016.

**D. His daughter was born and for life insurance purposes, Ryan stopped his medications.**

Ryan's daughter was born in July of 2020 – during the early stages of the COVID pandemic. During COVID, he continued to work delivering packages for UPS. But at home, he had a wife with an autoimmune deficiency and a newborn. The two adults started sleeping in separate rooms and trying to maintain a distance.

After his daughter's birth, Ryan sought life insurance for her in the event of his death. One of his PTSD medications disqualified him from being able to obtain the insurance. Ryan opted to discontinue his PTSD medications, his suboxone, his anti-depressants, and his anti-anxiety medications. Meanwhile, Ryan felt an immense amount of stress because "everyone needed everything." Ryan put himself in a perfect storm for addiction.

**E. Mr. Johnston developed a methamphetamine addiction**.

Mr. Johnston resumed an Adderall addiction. In 2022, on one of his delivery routes, a woman confronted him. She knew he purchased Adderall from people on his route and offered him a line of meth. That line led to years of addiction that persisted right up until Mr. Johnston was incarcerated for this case.

**F. Ryan sent a cry for help to the VA but never followed through for treatment.**

In August of 2022, Mr. Johnston reached out to the VA requesting care because he was "having issues that were good for a long time come back full force. First child and job overwhelming." (Exh. D – 014). This record also notes that Mr. Johnston had a 50% PTSD disability. (*Id.*). Medical records indicate that Ryan did not follow through on his request for treatment.

**G. The link between methamphetamine use and high-risk sexual behavior.**

Methamphetamine use comes with well-known negative consequences. Among other things, chronic methamphetamine use has negative consequences on a user's brain like poor problem solving, poor decision making, impaired judgment, disinhibition, and hypersexuality. James B. Hittner, *Meta-Analysis of the Association Between Methamphetamine Use and High-Risk Sexual Behavior Among Heterosexuals*, Psychology of Addictive Behaviors, Vol. 30, (Attached as Exh. E). "The experience of heightened sexual impulses, when coupled with increased energy, poor decision making, and disinhibition, all serve to greatly increase the probability that methamphetamine users will engage in high-risk sexual behavior." (*Id.*). The probability is so great that meth users are 37% to 72% more likely to participate in high-risk sexual behavior. (*Id.*).

**H. Mr. Johnston began to possess CSAM.**

Mr. Johnston's methamphetamine use fed into his pornography consumption. The high-risk sexual behavior Mr. Johnston engaged in was the consumption of CSAM and the "fantasy talk" he engaged in. Ryan reports that his pornography usage started with normal, nontaboo content but it did eventually escalate to CSAM consumption. Ryan would stay awake for three to four day stretches while consuming meth. He reports that the longer he stayed awake, the weirder his brain would get. He sought out other methamphetamine users online. That path led to CSAM.

A forensic examination of Mr. Johnston's cell phone indicated the oldest CSAM file on the device had a modified date of March 14, 2023. (USAO-000034). Between March 14, 2023, and January 23, 2025, Mr. Johnston came to be in possession of approximately 20 videos and 150 images of CSAM.

**I. Possession of CSAM does not, on its own, indicate a proclivity towards production or hands on offenses.**

Michael Sheath, a long time counselor for people with deviant sexual interests, describes a divide between types of offenders. Mr. Sheath spent over 33 years working with men who abuse children. He started with men who molested children but now also works with "downloaders of child abuse imagery and online groomers." Harriet Grant, *How Extreme Porn has Become a Gateway Drug into Child Abuse*, the Guardian, Dec. 15, 2020. (Exh. F – 001). Mr. Sheath divides men into two groups. "The first is older men whose sexual education and awakening came before the internet. They will have in the main learned about sex with another person who gives feedback, resistance, encouragement." (*Id.*). For this group, "…there was a ceiling on how much porn you could consume…It was limited in scope and there was a stigma on its consumption." (*Id.* at 002).

> "For the younger men who had their adolescence after about 2000, men up to 40, they will have watched a huge amount of online pornography before they have sex with a human being. And in my personal view that makes an absolutely enormous difference."

(*Id.*).

> It is the increasingly extreme themes available on mainstream porn sites that he thinks legitimise further deviant and criminal behaviour.
>
> "Anything you want to find you can Google. Typically these men I work with will have been watching porn that is freely available on the internet at eight, nine, 10 years old. This isn't looking at naked ladies, it's group sex, it's rape-themed, incest-themed. And that's at an age when I still believed in Father Christmas."
>
> "If you look at the videos on mainstream porn sites you can see 'teen' themes, 'mom and son' themes, lots of incestuous porn. It's pretty deviant stuff. To watch this you have already lowered your threshold of what is acceptable. Porn is an entry drug for a lot of them."

(*Id.*). Mr. Sheath explains that some of the men he works with go down what he calls a "potentially escalating pathway." (*Id.*). By getting used to and internally normalizing increasingly abusive themed pornography, some men take the step of watching real abuse of children. (*Id.*).

With respect to Mr. Sheath's treatment of the second group of individuals, he notes that a lot of his clients who have engaged with CSAM denied having an actual sexual interest in children. *Id.* In terms of treatment, he describes,

> "One of the exercises we do is I ask the men to tell me about an image they look at, I ask the girl's age, I say what do you reckon her name is, what does she like doing at school? They look absolutely horrified. They have never considered it. They are objectifying this child seeing them just as a mouth, or a body part. When I make them think this is a kid who goes to school and has a hamster, has a mum and dad, they don't like that, it's painful for them.
>
> "We can see a huge improvement in insight. They can reach a point where they have more empathy for the child. We have evidence that our work not only reduces reoffending but brings about changes in empathy levels.

(*Id.* at 003).

Mr. Sheath's observations were echoed in an article in the Journal for Interpersonal Violence. The article recognized that the increase in CSAM "does not necessarily indicate a corresponding rise in underlying sexual deviance." Melissa S. de Roos, Laura Willkomm, *Crossing the Line: Factors Associated with Escalating Pornography Use*, Journal of Interpersonal Violence Vol. 41 (2026) at 6252 (Attached as Exh. G). "Rather, it appears to be driven by situational factors linked to the increasing accessibility and normalization of online pornography, which may inadvertently facilitate exposure to extreme, and in some cases illegal, material." (*Id.* at 002). The article posits a different pathway than a pre-existing sexual preference for child material that leads a person to consume CSAM. (*Id.*). The second pathway "is driven by a progressive need for increasingly extreme pornographic content to achieve the same level of

arousal." (*Id.*). "The underlying mechanism is desensitization: prolonged exposure to mainstream pornography reduces arousal responsiveness, prompting individuals to seek greater novelty and intensity of content to reach the same level of arousal…" (*Id.*).. Along this pathway, the primary motivation becomes the thrill-seeking behavior and the pursuit of content extremity. *Id.* This study also notes that problematic pornography use "is intrinsically linked to the consumption of increasingly extreme material…" (*Id.* at 004).

Once someone has engaged with CSAM, the question becomes whether they will then escalate to a hands on offense. "What is the likelihood that an individual convicted of child pornography offenses has a prior history of a hands-on sexual offense involving a child or has a high probability of committing such an offense?" This question is the subject of a 2012 article in the American Psychological Association's Psychology, Public Policy, and Law journal titled *Predicting Hands-on Child Sexual Offenses Among Possessors of Internet Child Pornography*. (Attached as Exh. H). The article noted, "What portion of men who seek out child pornography are contact child sex offenders or are at high risk to be contact offenders is estimated by many studies to be relatively small." (*Id.* at 003). Still, identifying who among CP offenders are most likely to have a history of child sexual assault or be at high risk for committing such an assault "has obvious legal, as well as clinical import." (*Id.*). The study had a hypothesis about how to answer that question and sought to test it. The authors hypothesized that offenders "who had committed a hands-on child sexual abuse would be higher in antisociality than Internet-only offenders, while Internet offenders with no known contact offenses would be higher in Internet use history, a possible proxy for sexual preoccupation." (*Id.*).

The article does not define antisociality or sexual preoccupation but rather assumes an understanding of those terms. The APA dictionary of psychology defines antisocial personality disorder as,

> the presence of a chronic and pervasive disposition to disregard and violate the rights of others. Manifestations include repeated violations of the law, exploitation of others, deceitfulness, impulsivity, aggressiveness, reckless disregard for the safety of self and others, and irresponsibility, accompanied by lack of guilt, remorse, and empathy.

American Psychological Association (September 3, 2026), https://dictionary.apa.org/antisocial-personality-disorder. The Mayo Clinic offers some helpful context.

> Antisocial personality disorder, sometimes called sociopathy, is a mental health condition in which a person consistently shows no regard for right and wrong and ignores the rights and feelings of others. People with antisocial personality disorder tend to purposely make others angry or upset and manipulate or treat others harshly or with cruel indifference. They lack remorse or do not regret their behavior.

Mayo Clinic (September 3, 2026), https://www.mayoclinic.org/diseases-conditions/antisocial-personality-disorder/symptoms-causes/syc-20353928. Antisociality should not be confused with asociality in this context. Asociality relates to a preference for a lack of social interaction or a lack of sensitivity or regard for social values or norms. American Psychology Association, (September 3, 2026), https://dictionary-apa-org.libdata2015.hilbert.edu/asocial.

Sexual preoccupation is an intense focus on sexual fantasies, urges or behaviors. Mayo Clinic, (September 3, 2026), https://www.mayoclinic.org/diseases-conditions/compulsive-sexual-behavior/symptoms-causes/syc-20360434. The preoccupation can cause distress and problems for a person's health, job, relationships or other parts of life. *Id.*

The study was based on data from 466 male offenders. (*Id.* at 004).. Of those, 349 had committed a "child sexual offense, either Internet-based or hands-on, or both." (*Id.*).. The study refers to those who have committed an internet sexual offense only and no other known or self-reported hands-on offense as IO offenders. (*Id.*). Those who committed hands-on offenses only with no internet sexual offenses are referred to as CM offenders. Those who committed both types of offenses are referred to as IO + CM. (*Id.* at 004-005). The goal for the study was to see if the methodology used could successfully predict who among the Internet offenders was also a child molester. (*Id.* at 007).

Based on the first study discussed in the article, the authors concluded, "If we pose the simple question of the likelihood that someone charged with an Internet-related sex offense is also a hands-on child molester, the key factor of the presence of a history of nonsexual antisocial behavior, from childhood into adulthood, and the relative *un*importance of a history of preoccupation with the Internet is compelling." (*Id.* at 011). The authors concluded that internet offenders were low on antisocial behavior and high on internet preoccupation. (*Id.* at 020). Those with both hands on offenses and internet offense were high on both factors. (*Id.*).

Mr. Johnston does not have a history of antisocial behaviors. The article lists the antisocial behaviors considered on the final page. Mr. Johnston does have a prior conviction for a hands-off non-sexual offense for embezzlement. That behavior is reflective of drug use as opposed to antisociality.

**J. Ryan once again seeks treatment.**

Shortly after he began to consume CSAM, Ryan sent a panicky message to the VA in May of 2023 indicating he needed help filling out FMLA paperwork to avoid being fired. (Exh. D – 013).

Mr. Johnston followed through and had an evaluation by the VA in June of 2023. (*Id.* at 005-012). The medical records mention a January 2023 incident with his wife that led to his separation from her and his child. (*Id.* at 006). The report indicates several negative affective experiences Mr. Johnston was having. Ryan was not successful this time in pulling himself out of his situation.

In September of 2023, he sent a message to the VA,

> I'm in real trouble here sorry about my absence but been dealing with divorce, custody and mentally not well. I haven't been at work they are about to let me go because I haven't had my fmla paperwork filled out. I'm am about to lose it all. Can we please set up appointments or whatever we need to do without my job I literally have nothing. I will do everything I need to do. I just need something to give the hartoford to get a extension so I can go back to work and no get fired. I need help on this. Please contact me tell me what we can do so I don't lose my job then my ex will take my ptsd and use that against me im custody like she keeps saying. Thanku Ryan

(*Id.* at 004). The VA sought to stay in contact with Ryan to help but he was not responsive.

**K. Rock bottom and meeting M.**

Mr. Johnston left UPS in December of 2023 and, as he reports, "gave up on life." He wanted to die. His PTSD flared up. He was lost in his meth addiction. By January of 2024, he tried to get help again, this time by taking himself to the ER. (Exh. D – 001).

Near the end of January 2024, Ryan met his then girlfriend, M. Ryan had an adult sexual relationship with M. The two exchanged sexually related messages including photographs. Mr. Johnston sent photographs of his penis from inside the back of the UPS truck he was driving. M. reported that Johnston was deviant in his sexual interests. (USAO-000012). She described that his porn consumption included gang related things and dominance. (USAO-000012). M. reported that Mr. Johnston had ejaculated into her socks, underwear, and even shoes. (USAO-000012). He asked her to wear her socks after having done so but she refused. (USAO-000012). Ryan asked to have

a three-some which she refused. (USAO-000012). She believes he may have been bi-sexual. M. reported to law enforcement that would never have thought Ryan would be arrested for child exploitation. (USAO-00011).

This content is not intended to embarrass anyone. It is here because it is illustrative of the type of risky sexual behavior and thrill-seeking by Mr. Johnston that is consistent with a history of PTSD, a meth addiction, and those who consume CSAM but do not cross the line to hands on offenses.

**L. The Count 12A photograph is taken.**

The PSR includes an offense level calculation for "Count 12A", a count that Mr. Johnston did not plead guilty to. Count 12A corresponds to Count Eight of the indictment charging Mr. Johnston with production of child pornography for a photo taken of MV2 on August 30, 2024. The Government takes the position that this image meets the elements of a production offense. Mr. Johnston contends that he did not knowingly employ, use, persuade, induce, entice or coerce MV2 in the photograph.

In the photo, MV2's back is to the camera. She is fully clothed. An erect penis is in the photograph between the camera and the child. The Government contends the penis and/or testicles are touching the child. The defense contends that there is no touching.

Candidly, while high, Ryan took a dick pick. He intended to send it to M. but thought better of that when he noticed MV2 in the background. Ryan was experiencing the hyper sexuality and low impulse control that comes with meth addiction. He should have considered the fact MV2 was nearby, his MPFC ("watchtower") should have kicked in such that he left the room to take the dick pick.

**M. Mr. Johnston encountered Alex Buenaga online.**

Mr. Johnston was active on methamphetamine driven Reddit threads. He met Mr. Buenaga on a thread called 757-Kink. On or around January 22, 2025, Mr. Buenaga sent the CSAM videos to Mr. Johnston that underly Counts 12, 13, and 16.

**N. Law enforcement encountered Alex Buenaga online.**

An under cover employee of the FBI used Telegram to communicate with Mr. Buenaga from January 23, 2025, through January 24, 2025. (USAO-000030). Mr. Buenaga offered to "share" MV1 with the UCE. (USAO-000031).

**O. January 23, 2024**

Ryan Johnston and Alex Buenaga exchanged private messages with each other the day before their arrest. The two men discuss meeting up. The full text exchange between the men will be submitted to this Court under seal to protect the identities of the involved minors. From a time perspective, eastern standard time is five hours behind the UTC time listed on the exhibit. The times listed in this memorandum correspond to eastern standard time and have been adjusted accordingly from UTC time.

Separate from his conversations with Mr. Johnston, Mr. Buenaga made plans with "Doc" to meet and for the men to engage in sexual activity with MV1. At 11:39 PM on January 23, Doc asked Mr. Buenaga if Doc needed to bring anything. Their plans were temporarily waylaid when Doc messaged Mr. Buenaga a few minutes later noting he was 10 minutes away but needed to go in to work. The two discussed meeting later.

At 11:44 PM, Doc sent an image of a "large black male's penis" to Buenaga. (Buenaga Chat Review report). This image is relevant because Buenaga sent either the same image or one

like it to Mr. Johnston 11:47 AM the following day. Mr. Buenaga explained that "this dude" wanted to engage in sexual activity with MV1.

**P. January 24, 2025.**

At 12:23 AM on January 24, Mr. Buenaga told Mr. Johnston that Mr. Buenaga will be picking up an 8th of methamphetamine and he offers some to Mr. Johnston. The two men discussed meeting up and consuming the meth. Mr. Buenaga offered to split the 8th with Mr. Johnston for $55.

The two started making plans about where to meet. They initially discussed meeting in public. By the time they stopped messaging around 1:03 AM, they have not made set plans. Mr. Buenaga again emphasized that when he gets off work at 8:00 AM, he would go grab the meth.

Mr. Johnston resumed the conversation a few hours later at 6:57 AM. He suggested the men meet at the apartment he shared with M. Mr. Johnston suggested the two could smoke the meth and engage in sexual activity with each other. Ryan explained that he would be dropping off M. at 11:30 AM for a procedure and that he needed to pick her up by 5:00 PM. Mr. Johnston discussed involving children's underwear in the planned sexual activity with Mr. Buenaga.

At 8:56 AM, Mr. Buenaga asked if Mr. Buenaga could bring MV1 with him to Mr. Johnston's. Mr. Johnston consented noting that he has toys for the child to play with. The two then exchange a series of messages about other minors as detailed in the PSR. (PSR ¶ 23).

At 9:45 AM, Ryan again emphasized his desire to engage in sexual activity with Mr. Buenaga. Mr. Buenaga inserted MV1 back into the discussion. Mr. Johnston stayed focused on his desire to sexually interact with Mr. Buenaga. Mr. Buenaga then offered to allow Mr. Johnston to touch MV1. Ryan responds by stating they should see how things go and how they feel. He does

remark on kissing her and how that would make him feel. The two then engaged in another set of messages related to the other minors

At 11:38 AM, Mr. Buenaga changed the plan. He got too high to drive. Mr. Johnston reacted poorly believing he wouldn't have enough time to get out there and back by the time he has to pick up M. By 1:06 PM, Mr. Johnston agreed to meet at Mr. Buenaga's but states, "I can't stay and I'll come smoke a little and meet but this takes all the time we had…" Mr. Buenaga offered to give Mr. Johnston most of the meth he got today if Mr. Johnston made the drive. When Mr. Johnston arrived by 1:49 PM, he texted Mr. Buenaga and the two planned on smoking the meth in Mr. Buenaga's truck.

Also on January 24, 2025, Mr. Buenaga was engaged in communication with B Man. The two discussed meeting up after 4:30. Mr. Buenaga offered B Man access to MV1. Mr. Buenaga still had plans with Doc being made as well.

Alex Buenaga maintained his contact with the UCE on January 24, 2024. (USAO-000208). At an unknown time, Mr. Buenaga told the UCE that a man was coming over to "share" MV1. Law enforcement rushed to intercede.

**Q. Mr. Johnston's post-arrest interview.**

Law enforcement detained Mr. Johnston shortly after he arrived at Mr. Buenaga's home. Mr. Johnston gave an interview to law enforcement. When confronted with the messages between the two, Mr. Johnston explained that he did not know if Mr. Buenaga even had access to a child or if the content of their messages was "all fantasy talk." (USAO-000017). Ryan emphasized that he never planned to go inside. Mr. Johnston mentioned that there was an interest in "taboo fantasy kind of role play." (USAO-000018).

Ryan explained that he humored Buenaga's talk about MV1 to get the meth. (USAO-000021). He believed the chats were all fantasy and that he engaged in the conversation to appease Buenaga to get the meth. (USAO-000023).

Ryan told law enforcement about his meth addiction, losing his job, getting separated from his wife, and that his PTSD was causing problems. (USAO-00020). Ryan was seeking a source of meth because he owed $200 to his normal source. (USAO-000022).

Ryan showed law enforcement the messages he exchanged with Buenaga. Ryan adamantly denied have any intent to engage in sexual activity with MV1. He denied ever engaging an any sexual activity with any child and stated he would fight any claims that he did so "to the day he dies." (USAO-00032).

**R. Doc drove by.**

Doc drove past Mr. Buenaga's house as law enforcement was on the scene. When Doc saw the execution of the search warrant, he left.

**S. Negative Forensic Interviews of MV2 and the other minors.**

MV2 and the minors discussed by Mr. Johnston and Mr. Buenaga were all forensically interviewed. None of the children reported any abuse. The mother of the two minors was asked to check her children's underwear and socks for semen, the check their cell phones, and to search for secret or hidden folders. The mother did not report finding anything relevant.

## II. Guidelines

At the time of his arrest, Ryan Johnston was no where near the man he was when he was in Iraq. The man who could do the job of three marines was gone. He was jobless, entirely reliant on the help of others, in the throes of a heavy meth addiction, and was not in control of his PTSD. He had consumed CSAM and participated in inappropriate sexual messages about children.

The central question for this Court is whether Mr. Johnston's messages are indicative of a progression to a hands on offense or whether they are more likely a result of his psyche at the time and that he did hold a line against actually engaging in sexual activity with minors.

Mr. Johnston maintains all his original objections with the exception of the objection to Paragraph 24 regarding the number of images he possessed. The objection was resolved. Mr. Johnston will not address every outstanding objection herein. In this paper, Mr. Johnston will focus on the objections that affect the Guidelines calculation and the objections that are likely to have a significant impact on his overall sentence. For the other objections, Mr. Johnston will rely on them as reported to pretrial services.

A. **Whether Mr. Johnston intended to engage in sexual activity with MV1 -** Paragraphs 27, 34, and 35

Whether Mr. Johnston intended to engage in sexual activity with MV1 will have an impact on the overall sentence this Court imposes. The line between those who do not and have not engaged in hands on offenses and those who have or have attempted to is well recognized. Mr. Johnston belongs in the former category.

The entirety of the message exchange tells the story. From a content standpoint:

| **Subject Matter** | **Number of Relevant Messages** |
|---|---|
| Ryan's messages regarding meth, engaging in sexual activity with Mr. Buenaga, or both | 15 |
| Ryan's messages regarding sexual activity MV1 | 4 |

As for the messages involving MV1, each one was sent in response to a specific message from Mr. Buenaga. Ryan never initiated any discussion about MV1. Rather, Ryan consistently harped on his desire to engage in sexual activity with Mr. Buenaga.

**B. Count 12A -** Paragraphs 50-61

From defense counsel's perspective, there appear to be two different ways to interpret §1B1.2(c). The first way is akin to a mini-bench trial, the second way is akin to a guilty plea. Under either approach, the inclusion of Count 12A as a stand alone count of conviction is incorrect.

§1B1.2(c) provides,

> A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s).

U.S.S.G. 1B1.2.

Pertaining to Count 12A (Count 8 in the Superseding Indictment), the Statement of Facts contains a heading titled "Other Relevant Conduct." (Statement of Facts, Doc. 76, Page ID # 413). The parties agreed that certain facts would be presented to the Court for sentencing purposes. Mr. Johnston agreed that "had this matter gone to trial, the below facts would have been introduced against him." (*Id.*). Then for the specific count:

> 13. With respect to Count Eight, on the date and location listed in the superseding indictment, JOHNSTON produced an image file that depicted his own erect penis next to Minor Victim 2 while she was sleeping. JOHNSTON knowingly created the image file using his mobile phone, a device that had been shipped and transported in interstate and foreign commerce.

(*Id.* at Page ID # 415). For guidance, in application note 3, the Sentencing Commission explained "For example, if the defendant is convicted of one count of robbery but, as part of a plea agreement, admits to having committed two additional robberies, the guidelines are to be applied as if the defendant had been convicted of three counts of robbery." U.S.S.G. § 1B1.2, comment. (n.3).

**1. Mini-bench trial interpretation**

The Sixth Circuit Court of Appeals, citing to multiple cases from other circuits for support, held for the purposes of applying §1B1.2(c), "A defendant need not concede that he violated a statute; he need only admit facts that allow the court to conclude that his conduct satisfied the elements of an additional offense." *United States v. Nedelcu*, 46 F.4th 446, 451–52 (6th Cir. 2022). Under this approach, it does not matter whether the defendant admits guilt or even believes guilt can be found based on the facts presented. Rather, what matters is whether the sentencing court believes the facts stipulated to establish all the elements of the offense. In effect, it is like a mini bench trial. The court held, "Thus, Nedelcu's disagreement with the money-laundering enhancements does not, standing alone, bar application of § 1B1.2(c). Rather, Nedelcu's factual admissions are what matters. And, as described above, those admissions establish violations of § 1956." *Id.* at 452.

The Sixth Circuit applied the approach but found all the elements had not been met in *United States v. Pennington*, 78 F.4th 955 (6th Cir. 2023). In the case, the plea agreement stated that the Government could prove and the defendant admitted that, with respect to an 18 U.S.C. § 1591(b)(1) offense for sex trafficking of children or by force, fraud, or coercion, "Pennington 'knew his neighbor, Logan Ray Towery, to prostitute young women,' 'paid several young women for sexual acts,' 'had knowledge that Towery was arrested ... and charged with conspiracy to engage [in] human trafficking, in violation of 18 U.S.C. § 1594(c),' and 'was subsequently arrested

for the same offense.'" *Id.* at 969. Yet, with all those admissions, the court held, "Pennington's plea agreement fails to address all of the requisite elements of 18 U.S.C. § 1591(b)(1)." *Id.* "The plea agreement does not address, for example, the requirement under 18 U.S.C. § 1591(b)(1) that 'the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2),' or the interstate-commerce element described in 18 U.S.C. § 1591(a)(1)." *Id.* "Accordingly, U.S.S.G. § 1B1.2(c) does not apply here." *Id.*

In *United States v. Gutierrez-Sanchez*, the Ninth Circuit applied this approach. The crime at issue was being illegally present in the United States in violation of 8 U.S.C. § 1326. 587 F.3d 904, 907 (9th Cir. 2009).

> Gutierrez admitted all the elements of the latter offense: that (1) he was an alien who (2) had been lawfully deported and (3) had entered the United States (4) without the permission of the Attorney General and (5) had the requisite general intent, i.e., he knew he was illegally in the United States when he entered the United States in violation of a prior deportation order and gave a false name to the federal officers.

*Id.* at 907-908. The court specifically noted that the mens rea element was met. "Because Gutierrez' plea agreement establishes the mens rea necessary for a 'found in' offense under § 1326, we need not address his argument that his plea agreement did not establish the specific intent needed to violate the prohibition in § 1326 against attempted reentry." *Id.* at 908.

As the Supreme Court noted in *Braxton v. U.S.*, for an offense to be "specifically established," the stipulation must include all the elements of that offense. *Braxton v. United States*, 500 U.S. 344, 349 (1991) ("Thus, even assuming that Braxton's agreement to facts constituted a 'stipulation' for purposes of § 1B1.2(a), unless it 'specifically established' an attempt to kill under 18 U.S.C. § 1114, the sentence based upon the Guideline for that offense cannot stand."). In *Braxton*, the issue was whether the stipulated facts established an attempt to kill under 18 U.S.C.

§ 1114. *Id.* at 349. The Court noted that while the stipulation covered that the defendant shot through a door opening. *Id.* The stipulation did not say that the defendant shot at the marshals. *Id.* at 350. Even then, the Court specifically noted,

> But even if one could properly conclude that the stipulation "specifically established" that Braxton had shot "at the marshals," it would also have to have established that he did so with the intent of killing them.* Not only is there nothing in the stipulation from which that could even be inferred, but the statements of Braxton's attorney at the hearing flatly deny it.

*Id.* at 350–51. The Court concluded,

> The only issue for resolution is whether a stipulation that at best supports two reasonable readings—one that Braxton shot across the room at the marshals when they entered, and one that he shot across the room before they entered to frighten them off—is a stipulation that "specifically establishes" that Braxton attempted to murder one of the marshals. It does not.

*Id.* at 351.

*Braxton* is instructive to the case at hand. As was the case in *Braxton*, Mr. Johnston's plea agreement does not establish all the elements of the offense. The elements of 18 U.S.C. § 2251(a) are "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." *United States v. Malloy*, 568 F.3d 166, 169 (4th Cir. 2009). Mr. Johnston did not stipulate that he used MV2 to take part in sexually explicit conduct. Unlike in *Gutierrez-Sanchez*, there is no stipulation as to the mens rea element.

The fact his erect penis is in the photograph does not meet the mens rea element. As was the case in *Braxton*, there is, at minimum, ambiguity here. The Government urges this Court to

assume the use element is met simply by the erect penis. However, the defense contends that Mr. Johnston was taking a penis picture for his girlfriend and, as observed in some people with PTSD and methamphetamine addiction, was too hyper focused on thinking about sex to take into account the child was nearby.

Defense counsel has not located a single case where an erect penis alone has been held sufficient to establish the elements. In relevant part to Mr. Johnston's case, the definition of sexually explicit conduct includes actual or simulated masturbation or the lascivious exhibition of the anus, genitals, or pubic area of any person. 18 U.S.C. § 2256(2)(A). As recently recognized by the Fourth Circuit, Congress did not expressly define "lascivious exhibition." *United States v. Sanders*, 107 F.4th 234, 261 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 1434, 221 L. Ed. 2d 557 (2025).

The Fourth Circuit has adopted the *Dost* factors for determining whether a visual depiction is lascivious. *United States v. Sanders*, 107 F.4th 234, 263 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 1434, 221 L. Ed. 2d 557 (2025). In adopting use of the *Drost* Factors, the Fourth Circuit expressly ordered that trial courts should ensure that a jury (1) is not instructed to rely exclusively on the *Dost* Factors, (2) understands that no single *Dost* Factor is dispositive, and (3) is discouraged from a strict and mathematical application of the *Dost* Factors. *Id.* The *Dost* Factors are:

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
> (4) whether the child is fully or partially clothed, or nude;
> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 261.

As a threshold matter, nudity is insufficient as a matter of law. As held by the Fourth Circuit,

> As an initial matter, we agree with Courtade that **the statute by its terms "requires more than mere nudity, because the phrase 'exhibition of the genitals or pubic area' ... is qualified by the word 'lascivious.'** " United States v. Villard, 885 F.2d 117, 124 (3d Cir. 1989) (citation omitted); see also United States v. Amirault, 173 F.3d 28, 33 (1st Cir. 1999) (explaining that "the statute requires more than mere nudity"). Based on the statutory language, then, that Jane Doe appears nude in the video cannot suffice to prove that the video meets the statutory definition. If that were so, the word lascivious would become superfluous. See Rubin v. Islamic Republic of Iran, ––– U.S. ––––, 138 S. Ct. 816, 824, ––– L.Ed.2d –––– (2018) (courts must give effect to every provision of a statute).

*United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019), *as amended* (July 10, 2019) (emphasis added).

In *U.S. v. Osuba*, the Second Circuit found the fact the adult male was masturbating in the depiction to be outcome determinative. The minor was a 17 year old girl who was fully clothed and asleep on a couch. *United States v. Osuba*, 67 F.4th 56, 59 (2d Cir. 2023). The defendant created two short videos. *Id.* "They show him masturbating close to the minor—first sitting or lying near the couch, then standing over the minor and ejaculating toward her. He was 'getting off,' he later said, to 'the image of [the teenage girl] on the couch.' 'I came on her,' he told the other Kik user, attaching the videos. *Id.* at 59-60 (internal citations omitted). The Second Circuit reasoned that while the statute requires engagement of the child, the engagement "can be active or passive." *Id.* at 62. The Second Circuit held that a rational jury could have concluded that the defendant used the minor to engage in sexually explicit conduct. *Id.* at 63.

> Osuba's sexual activity was wholly directed toward her, in a way that rendered her a participant (albeit a passive one) in that activity. He set up the camera to show her right next to him. He ejaculated toward her, missing her arm only narrowly. He told the Kik user to whom he sent the videos, "I came on her." Gov't. Ex. 18-J at 0:12. He said that he was "getting off" to her presence. Gov't. Ex. 18-C at 2:03. By creating a video depicting a form of "sexually explicit conduct" enumerated in § 2256(2)(A) (here, masturbation), the intended consummation of which was visibly directed toward a minor who was physically present, Osuba crossed the line from "a simple display of adult genitals around a sleeping minor" to showing his victim as "an inanimate body" upon which he was acting sexually. Lohse, 797 F.3d at 521.

*Id.*

In *U.S. v. Sprenger*, the Seventh Circuit held that the minor must be engaged in sexually explicit conduct. The defendant,

> took photographs of Victim A while she was sleeping and in them, he photographed his naked, erect penis next to Victim A's face, and his own face, with tongue sticking out, next to Victim A's clothed groin. He also admitted in the plea agreement that he used Victim A to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.

*United States v. Sprenger*, 14 F.4th 785, 791 (7th Cir. 2021). The Seventh Circuit found the district court plainly erred in accepting the defendant's plea to child production based on those facts. *Id.* The court noted a prior holding, "In *Howard*, we held that § 2251(a) requires that the offender create images that depict a minor, and not the offender alone, engaged in sexually explicit conduct. 968 F.3d at 721." *Id*. In *Howard*, the Seventh Circuit, "we read § 2251(a)'s language as requiring "the government to prove that the offender took one of the [statute's] listed actions to cause *the minor* to engage in sexually explicit conduct for the purpose of creating a visual image of that conduct." *Id.* (emphasis in original)." *Id.*

> And given the defendant in *Howard* created images of himself masturbating next to a clothed, sleeping minor, we vacated his

> conviction because the images he created were not child pornography as they showed only him and not the minor engaged in sexually explicit conduct. *Id.* at 718, 724. So too here. Because the photographs Sprenger took depicted himself but not Victim A engaged in sexually explicit conduct, Sprenger's conduct does not qualify as a violation of § 2251(a).

*Id.*

The *Eleventh* Circuit took a different approach in a masturbation case in *United States v. Dawson*. In the case, the court asked, "whether an offender 'uses' a minor in violation of § 2251(a) only by having the minor engage in sexually explicit conduct, or whether an offender 'uses' a minor when the minor's presence is the object and focal point of the offender's sexual desire as the offender, not the minor, engages in the sexually explicit conduct." *United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir. 2023). In the case, the court noted, "Dawson's daughter is not merely present in the videos where Dawson happens to be exposing his penis and masturbating. Rather, Dawson's daughter—or to be more precise, her presence—is being used as the object of Dawson's sexual desire as he engages in sexually explicit conduct." *Id.* at 1238. The court noted the defendant, "panned the camera from the child to himself masturbating and back to the child, recording his exposed and erect penis in close proximity to the child—even going so far as to touch her hair with his penis in one video." *Id.* "Dawson further admitted that having his eleven-year-old in his presence while he masturbated was arousing." *Id.* The court concluded, "Because Dawson's daughter was passively involved in Dawson's sexually explicit conduct by serving as the object of Dawson's sexual desire, Dawson's actions constituted the use of a minor to engage in sexually explicit conduct in violation of the statute." *Id.*

The Eleventh Circuit explicitly disagreed with the Seventh Circuit's approach in *Howard*, cited in by *Sprenger*. In rejecting the *Howard* reasoning that the interpretation of the term "uses"

may make the statute too broad and its hypothetical, the Eleventh Circuit explained, "Here, unlike in the *Howard* hypothetical, Dawson admitted that he found the act of masturbating to his daughter *in her presence* sexually arousing. In other words, it was the child's presence that Dawson found sexually arousing, which is a circumstance entirely different from the *Howard* hypothetical where the child is not immediately present." *Id.* at 1238. "Here, Dawson used the presence of his eleven-year-old daughter as the object of his sexual desire as he engaged in sexually explicit conduct by masturbating in her presence. He recorded this conduct and distributed it over the internet." *United Id.* at 1239.

Recently, in *United States v. Deritis*, the Fourth Circuit addressed nudity in the context of the *Drost* Factors. The Fourth Circuit clarified that a district court's reliance on the *Dost* factors in jury instructions is permissible where "the trial court ensures that the jury: (1) understands that mere nudity is not sufficient to establish a "lascivious exhibition"; (2) is not instructed to rely exclusively on the *Dost* Factors, (3) understands that no single *Dost* Factor is dispositive, and (4) is discouraged from a strict and mathematical application of the *Dost* factors. 107 F.4th at 263." *United States v. Deritis*, 137 F.4th 209, 220 (4th Cir.), *cert. denied,* 146 S. Ct. 270, 223 L. Ed. 2d 100 (2025). The court found that a visual depiction of the appellant's penis with his minor step-daughter's hand depicted sexually explicit conduct. *Id.* at 221. The court noted that the minor's hand was touching the penis. *Id.* at 215.

Mr. Johnston anticipates that an analysis of the *Dost* Factors will weigh against concluding that the image is lascivious. The focal point is not on the child's genitalia or pubic area. The setting is not sexually suggestive. The child is not in an unnatural pose or in inappropriate attire. The child is fully clothed. The image does not suggest sexual coyness or a willingness to engage in sexual activity. As recognized in *Deritis*, mere nudity is not sufficient to establish a lascivious exhibition.

While strict adherence to the *Drost* Factors is not required and they are not an exclusive list of factors, finding the image at issue in Mr. Johnston's case is lascivious although none of the *Dost* Factors are met is akin to ignoring them entirely.

Unlike in *Thomas*, the child's genitalia are not exposed. Unlike in *Osuba* and *Dawson*, there is no masturbation which expressly falls within the definition of sexually explicit conduct and does not require a lascivious analysis. Unlike in *Sprenger*, the male did not place his penis next to the child's face nor did he stick out his tongue next to the child's groin. Unlike in *Dawson* and *Deritis*, the male did not touch the child.

The facts set forth in the Plea Agreement do not establish all of the elements of a production charge. The erect penis alone does not render the image lascivious on its own.

**2. Guilty plea interpretation**

The commentary in application note 3 with respect to the robbery example use the words "admits to having committed…." Interestingly, the Sixth Circuit has also found that, even where the facts are not stipulated to, an admission of guilt can still suffice for application of §1B1.2(c). In *United States v. Watson*, the defendant argued that his sentencing attorney erred by failing to object to the treatment of three additional bank robbery charges as pseudo counts "because he did not admit each element of those offenses in his plea agreement…"*United States v. Watson*, No. 23-3171, 2024 WL 5252018, at *2 (6th Cir. Oct. 16, 2024), *cert. denied,* 145 S. Ct. 1153, 220 L. Ed. 2d 443 (2025). The Sixth Circuit observed, "In the plea agreement, the parties agreed that Watson 'committed the five bank robberies listed in the indictment.'" *Id.* Despite the fact that neither the elements nor the underlying facts were specifically laid out in the plea agreement, the Sixth Circuit held that the district court properly treated the additional robberies as pseudo counts. *Id.* This approach is akin to a guilty plea.

In Mr. Johnston's case, he intentionally avoided admitting guilt to the production offense. Not only was the mens rea element not addressed but the prefacing language before the inclusion of the relevant facts specifies that the facts would be presented at sentencing and would have been introduced against him during trial. Mr. Johnston did not stipulate that the facts were true and, even if they are, whether they could amount to a conviction of the production offense.

The PSR concludes to the contrary by misreading the terms of the Plea Agreement. Paragraph 3 of the Plea Agreement states,

> **3. Factual Basis for the Plea**
>
> **The defendant will plead guilty because the defendant is in fact guilty of the charged offense. The defendant admits the facts set forth in the Statement of Facts filed with this Plea Agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The Statement of Facts, which is hereby incorporated into this Plea Agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(c) of the Sentencing Guidelines.**

(Plea Agreement, Doc. 75, Page ID # 397). The Plea Agreement could have been drafted better to mirror the distinction in the Statement of Facts between the "Counts of Conviction" (Page ID 412) for which Mr. Johnston does admit the facts and agrees that the facts establish guilt of the offenses and "Other Relevant Conduct" to which the parties explicitly avoided agreeing that the facts established additional offenses. By its terms, the parties did agree that the facts would be presented to this Court for sentencing and would have been introduced during trial. Paragraph 3 of the Plea Agreement cannot be used to override the language in the Statement of Facts. Simply put, Mr. Johnston did not agree that the facts under "Other Relevant Conduct" establish guilt of additional offenses.

**3. Whether the offense involved sexual act or sexual contact –** Paragraph 51

The offense did not involve a sexual act or sexual contact. The Guidelines direct us to 18 U.S.C. § 2246(2) for the definition of "sexual act." §2G2.1 comm. n. 2.

> (2) the term "sexual act" means--
> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
> (D) the intentional touching, not through the clothing, **of the genitalia of another person** who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;

18 U.S.C.A. § 2246(2) (emphasis added). The penis is not making contact with the vulva or anus of the child. There is no contact between a mouth and the penis, a mouth and a vulva, or the mouth and the anus. There is no penetration of any body part. There is no intentional touching of the genitalia of the child. Whether, as the Government claims, the image demonstrates by a preponderance that Mr. Johston's testicles are touching the child is immaterial. The definition requires Mr. Johnston to be touching the child's genitalia.

For sexual contact, the Guidelines direct us to 18 U.S.C. § 2246(3). §2G2.1 comm. n. 2.

> (3) the term "sexual contact" means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;

18 U.S.C.A. § 2246(3) (emphasis added). At this time, defense counsel cannot recall whether a hand is visible in the image. Absent a hand, Mr. Johnston cannot be said to be "intentionally

touching" the genitalia of his own person for the purposes described in the definition. Even if his hand is visible touching his penis, there would need to be masturbation in order for the definition to fit. In *United States v. Skinner*, the Fourth Circuit held that masturbating during a video call fits the definition. *United States v. Skinner*, 70 F.4th 219, 230-231 (4th Cir. 2023). "Here, Skinner admitted, as part of his plea agreement, that he masturbated during the live video sessions with R.D., and there is no question that he did so with the requisite intent." *Id.* at 230. The fact the image does not depict masturbation is outcome determinative. *See United States v. Aldrich,* 566 F.3d 976, 979 (11th Cir. 2009) ("Based on our review of the record and the relevant law, we conclude as the district court did that the plain meaning of 'sexual contact' under U.S.S.G. § 2G2.1(b)(2)(A) and 18 U.S.C. § 2246(3) includes the act of masturbating."); *United States v. Raiburn*, 20 F.4th 416, 424 (8th Cir. 2021) ("Determining that § 2246(3)'s definition of "sexual contact" includes masturbation, however, does not end our inquiry into the applicability of the enhancement."); *United States v. Pawlowski*, 682 F.3d 205, 213 (3d Cir. 2012) ("The District Court, therefore, correctly interpreted § 2G1.3(b)(4)(A) to include masturbation as a form of 'sexual contact' covered by the language of the section.").

For the record, Mr. Johnston objects to the Government's conclusion that his penis and/or his testicles are making contact with the child in the image.

## III. Acceptance of Responsibility

This case was resolved on the eve of trial. Trial was set to commence on June 15, 2026. (Order, doc. 65, Page ID # 335). Mr. Johnston signed a plea agreement on June 7, 2026. The Government has represented that it will not move for a third point for acceptance of responsibility.

Mr. Johnston asks this Court for consideration of the dispute between the parties in this case. Since the onset of this case, Mr. Johnston has been willing to resolve the case by pleading

guilty to the receipt and possession charges. For the reasons set forth in Mr. Johnston's Trial Brief (Doc. 71), it has been the defense's perspective that even taking the facts in the light most favorable to the Government, the facts do not establish the elements of a coercion charge or the production charge. Should this Court agree with defense counsel's perspective as laid out in the Trial Brief, then Mr. Johnston should not be penalized for refusing to plea to those offenses. A downward variance specifically to address the lack of the additional point is appropriate.

## IV. Mitigating Factors, Aggravating Factors, and Problems with the Guidelines

There are widely recognized problems with how the Guidelines deal with child pornography offenses. The Sentencing Commission's 2012 *Federal Child Pornography Offenses*[3] report explained that sentencing data indicated "that a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.* at ii. The Commission found, "…the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability." *Id.* "…[F]our of the six sentencing enhancements in §2G2.2 – those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels – now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability." *Id.* at iii. The commission specifically noted, "The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet." *Id.* at ii-iii.

---

[3]https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

Mr. Johnston is subject to enhancements that apply to most offenders. According to a 2021 follow up report by the Sentencing Commission, "A majority of the non-production child pornography offenders had images or videos of very young victims." U.S. Sent. Comm'n, *Federal Sentencing of Child Pornography Production Offenses* (Oct. 2021), at 31.[4] Of the defendants sentenced in 2019, "over half (52.2%) of the offenders had images or videos of infants or toddlers (22.8% and 29.4%, respectively) and nearly every offender (99.4%) had images or videos depicting victims who were prepubescent or under the age of 13." *Id.* Mr. Johnston is subject to enhancements related to age. The involvement of multiple victims is also a common fact. Forty-one percent of 2019 cases involved more than one minor victim "ranging from two to 440 victims." *Id.* at 4.

While these factors are aggravating as compared to defendants who lack them, these factors do not distinguish Mr. Johnston from most defendants sentenced.

As to the disputed pseudo count, the Sentencing Commission, in its 2021 report, forty percent of the pornography production offenders "incapacitated, coerced, or enticed a minor victim, or misrepresented their identity to facilitate the child pornography production offense." *Id.* at 37. One in five coerced a minor to participate in the offense. *Id.* at 38. The most common type of coercion used was "sextortion." *Id.* at 38. "It involves coercing a minor by using, or threatening to use images or videos previously obtained to demand that the minor engage in a sexual act with the offender or to demand additional images or videos that are sexual in nature." *Id.* "Sextortion can take many forms, including making threats to harm family or friends unless the victim

---

[4] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf

complies with demands, hacking to gain access or control of the computer's webcam to obtain images and videos, or leading the victim to believe the perpetrator can be trusted." *Id.* To the extent this Court finds Mr. Johnston to have produced child pornography, none of these aggravating factors are present.

The inability of the Guidelines to capture meaningful distinctions between offenders is observable through examining local cases with the same or similar Guidelines to Mr. Johnston, using the offense level of 41 set forth in the PSR.

Rian Johnson also had a Guideline offense level of 42 with a criminal history category of I. *USA v. Rian Wayne Johnson*, 4:25-cr-00059 (E.D. VA), Government's Position Paper, Doc. 27. Mr. Johnson was the primary care giver of an 11 year old child who he sexually exploited by having her perform oral sodomy on him. *Id*. Mr. Johnson recorded videos of a sexual nature of the child on his cell phone. The Government emphasized that the "defendant repeatedly sexually abused Jane Doe and documented the abuse." *Id.* The Government recommended a sentence of 30 years in prison. *Id.* Mr. Johnson was sentenced to 324 months for sexual exploitation of children. Judgment Entry, Doc. 33.

Shane Harlacher's Guideline range was one offense level is the same as Mr. Johnston's. *USA v. Shane Matthew Harlacher*, 2:25-cr-63 (E.D. VA ), Government's Position Paper, Doc. 32. Mr. Harlacher's Guideline level was 41 with a criminal history category of I. *Id.* Mr. Harlacher was attributed with having 8,657 CSAM files which he had collected since 2017. *Id.* That content included sexual abuse of a toddler and a girl being choked by an adult male. *Id.* Mr. Harlacher obtained "a spy camera and secretly filmed a 13-year-old child, Jane Doe, in the bathroom at his home in Virginia Beach. *Id.* "He did so on several occasions, and then later edited and clipped the videos to maximize his sexual gratification to focus on Jane Doe's genitalia." *Id.* The Government

recommended that sentence within the 324 to 360 month Guidelines range would be appropriate. *Id.* He was sentenced to 300 months for production of CSAM. Judgment Entry, Doc. 43.

In summary, overreliance on the Guidelines to fashion an appropriate sentence for Mr. Johnston will result in a sentencing disparity and/or a sentence that is greater than necessary. The aggravating factors in Mr. Johnston's case like age of the children involved and his relationship to one of them are prevalent in most cases. The Guidelines' attempt to distinguish offenders based on those factors is, as recognized by the Sentencing Commission itself, ineffective. It is unreasonable that for all practical purposes that Ryan Johnston finds himself with the same offense level as Johnson or Harlacher.

## V. Sentencing Disparities

Avoiding unwanted sentencing disparities is difficult under §2G2.1 and 2.2 due to the problems with the Guidelines noted above. According to the Judiciary Sentencing INformation, for the 35 defendants with a final offense level of 41 under §2G2.1 (Count 12A) and a criminal history category of II, 61% of them received a downward departure or variance. Under §2G2.2 (Count Group 1), only 4 defendants had a final offense level of 41 and a criminal history category of II. In the absence of reliable national statistics, the facts underlying comparable local cases from 2026 highlight mitigating and aggravating factors for this Court to consider as it seeks to avoid unwarranted sentencing disparities.

### A. Prior convictions for sex offenses

Christopher Charles Collins was sentenced to 180 months for attempted coercion and enticement of a child and receipt of child pornography. *USA v. Christopher Charles Collins*, 4:26-cr-19 (E.D. VA), Judgment Entry, Doc. 30. Mr. Collins "engaged online with an undercover officer posing as a 14-year-old female" on social media. Government's Position Paper, Doc. 25. He was

arrested when he arrived to meet the purported child. *Id.* The defendant "admitted to chatting online with underage girls…" *Id.* He was "attributed with over a thousand images of child pornography." *Id.* Notably, the defendant committed the offense while on supervised release. *Id.* He had a 2018 conviction the Western District of Virginia for the Attempted Transfer of Obscene Material to Person Under 16 Years of Age and Possession of Child Pornography. *Id.* He was given 78 months for the prior federal conviction. *Id.* For the Eastern District of Virginia case, the Government recommended a sentence of 188 months. *Id.*

Keonte Martin was sentenced 180 months for receipt of child pornography. *USA v. Keonte Navon Martin*, 4:25-cr-37, (E.D.VA), Judgment Entry, Doc. 40. The defendant had a prior federal conviction for possession of child pornography for which he was sentenced to 48 months in prison. Position on Sentencing by USA, Doc. 37. While finishing his sentence at a half-way house, the defendant was found to be in possession of a phone with child pornography on it. *Id.* The defendant was attributed with over 600 images of child pornography. *Id.* On his prior conviction, he was attributed with 11,000 picture files and 51 videos of child pornography and exploitation. *Id.* The Government recommended a sentence of 15 years. *Id.*

Unlike these defendants, Mr. Johnston does not have a prior sexual offense related conviction. He has a misdemeanor theft conviction.

**B. Multiple hands on offenses while producing CSAM**

Kemp Nelson was sentenced to 180 months for sexual exploitation of a child. *USA v. Kemp Jermaine Nelson*, 4:25-cr-68 (E.D. VA June 24, 2026), Judgment Entry, Doc. 51. Mr. Nelson had an offense level of 43 and a criminal history category of III. Government's Position Paper, Doc. 48. The defendant reported that he was dating a 16 year old and, because he understood that the minor was homeless, was helping her out by giving her a place to stay. Statement of Facts, Doc.

41. Mr. Nelson had sex with the minor and posted a video of the two engaged in sexual intercourse on his Twitter account. *Id.* The defendant described himself to law enforcement as a "content creator" and "porn star." *Id.* The Government recommended a sentence of 180 months. Government's Position Paper, Doc. 48.

Asia Billups was sentenced to 180 months for two counts of production of child pornography and one count of distribution of child pornography. *USA v. Asia Billups*, 4:24-cr-70, (E.D. VA) Judgment Entry, Doc. 74. Ms. Billups Guidelines level was 43 with a criminal history category of I. Government's Position Paper, Doc. 70. Ms. Billups produced digital video files of sexually explicit content with minors whom she was babysitting. Statement of Facts, Doc. 52. One of the minors was three years old. *Id.* The other minor was four months old. *Id.* Ms. Billups exchanged in appropriate messages with a co-defendant about the content of the videos. *Id.* The Government recommended a sentence of 540 months comprised of two 240 month sentences and one 60 month sentence to run consecutively. *Id.*

Jose Sosa was sentenced to 144 months for coercion and enticement of a minor. *USA v. Jose Alexis Valdez Sosa*, 2:25-cr-65 (E.D. VA), Judgment Entry, Doc. 56. Sosa traveled from Ohio to Norfolk to pick up MV1. Government's Position Paper, Doc. 44. Law enforcement became involved to assist with the missing child. The defendant had a hands on relationship with MV1. He recorded some of their sexual activity. The Government noted the demeaning manner in which the defendant engaged with MV1 noting specifically instructing her to get on all fours and masturbate using a marker. The defendant also falsely identified himself as a minor in conversations with other minors on WhatsApp. Moreover, the defendant "used covert means" to contact MV1 after being arrested and charged for the offense. *Id.* Sosa had an offense level of 35

with a criminal history category of I. The Government recommended a sentence at the high end of the Guidelines range which was 168-210 months.

Corey Hambley's Guidelines offense level of 49 (with a criminal history category of I) is immaterial given the sentencing table already assigns life at an offense level of 43. *USA v. Cory Richard Hambley*, 2:25-cr-44 (E.D. VA 2026), Position on Sentencing by USA, Doc. 78.

> The defendant, who held a Top Secret security clearance and worked in missile defense for the U.S. Navy, was married, and owned an expensive, 9-bedroom home, instigated a scheme whereby his ex-girlfriend, co-defendant Grace Paradis, recorded herself repeatedly sexually molesting two girls, then 5 and 9 to 6 and 10 years old, for the defendant's sexual gratification.

*Id.* "The defendant plied Paradis with rent money and the potential of future marriage to induce her to record herself showering with the girls and rubbing their breasts, shaving their pubic areas, and most diabolically, orally sodomizing them while they slept, on multiple occasions." *Id.* "He also proposed Paradis drug the young girls to facilitate their sexual abuse." *Id.* "The defendant and Paradis further drew up a contract specifying rules for grooming and molesting future children they would have together." *Id.* The defendant secretly recorded another minor "to whom he had access" masturbating. *Id.* He sent that same child a video of that child's mother performing oral sex on the defendant "in an apparent grooming effort." *Id.* Notably, the defendant had secretly recorded two adult victims who served in the Navy with him years beforehand. *Id.* Corey Hambley was sentenced to 420 months for conspiring to produce visual depictions of minors engaged in sexually explicit conduct and use of an interstate commerce facility to do so. The Government recommended a life sentence. Grace Paradis, Corey Hamble's ex-girlfriend, was sentenced to 340 months. *USA v. Grace Elizabeth Paradis*, 2:25-cr-44 (E.D. VA 2026).

Unlike in these cases, the Government is having to infer that Mr. Johnston was going to engage in a hands on offense. In contrast, Kemp Nelson held himself out to be a porn star. Asia Billups repeatedly produced files of sexually explicit content with a toddler and a baby. Sosa took a child from her home. As to Hambley, it is difficult to fathom how Mr. Johnston could be said to be deserving of a higher sentence.

**C. Production of CSAM committed without touching a child**

Skylar James Duvall was sentenced to 204 months. *USA v. Skylar James Duvall*, 4:25-cr-25 (E.D. VA March 13, 2026), Judgment Entry, Doc. 33. According to the Government's position paper, Mr. Duvall recorded a live streaming of a minor being sexually abused by her guardian. Government's Position Paper, Doc. 28. "Even more concerning was the chat that was being had between the defendant and the guardian wherein the defendant was arranging for a determined amount of time and providing payment to the guardian for certain sex acts to be done to Jane Doe 1 during the allotted time he purchased." *Id.* The defendant possessed over 500 images and 700 videos of CSAM. *Id.* The Government asked for a sentence of 240 months. *Id.*

Yahmir Hamlet was sentenced to 240 months. *USA v. Yahmir Deshawn Kawante Hamlet,* 4:25-cr-36 (E.D. Va April 15, 2026), Judgment Entry, Doc. 44. Mr. Hamlet, according to the Government, had an offense level of 40 and a criminal history category of I. Government's Position Paper, Doc. 39. The Government recommended a sentence of 292 months. *Id.* According to the Statement of Facts, Mr. Hamlet was in the business of buying and selling CSAM. Statement of Facts, Doc. 29.

Mr. Johnston's conduct, even when taken from the Government's perspective does not reach the level of Duvall's conduct. In Duvall's case, the defendant directed some of the acts. At most in Mr. Johnston's case, he could be said to have acquiesced to conduct entirely controlled by

Mr. Buenaga. Mr. Johnston's case is unlike Hamlet's as Mr. Johnston did not seek to convince minors to create CSAM for him.

## VI. Ryan has support for his future

Given his conditions and the scope of his conduct, there is reason to believe Mr. Johnston will benefit from the treatment he will receive in the BOP. We can hope that once he is released, he will be closer to the man he used to be. To that end, Ryan has the support of friends and family who knew him when he thrived and can help him get back to the person they know him to be. Letters in Support, Exh. I.

Respectfully submitted,

*/s/ Stephanie F. Kessler*
STEPHANIE F. KESSLER (0092338)
Kessler Defense LLC
500 East Main St, 1600
Norfolk, VA 23510
(513) 316-5807
stephanie@kesslerdefense.com

*Attorney for Ryan Johnston*